NASHBAN BARREL & CONTAINER COMPANY, Respondent,
v. G. G. PARSONS TRUCKING COMPANY and another,
Appellants.

*No. 15. Argued November 30, 1970.—Decided January 8, 1971.*
(Also reported in 182 N. W. 2d 448.)

594

For the appellants there was a brief by *Kivett & Kasdorf,* attorneys, and *Keith I. Johnston* of counsel, all of Milwaukee, and oral argument by *Mr. Johnston.*

For the respondent there was a brief by *Usow, Teper & Weiss* of Milwaukee, and oral argument by *Herbert L. Usow.*

WILKIE, J.    Three issues are raised on this appeal involving the trial court's failure to give certain instructions requested by the appellants at the time of trial:

1.  Did the trial court err in failing to instruct that if respondent's vehicle was not susceptible of repair, no damages for loss of use of the vehicle were to be allowed?

2.  Did the trial court err in failing to instruct that if it found that both the rules of repair cost and diminished market value applied, the jury should insert the lesser of the two amounts in answering the trailer-damage question?

3.  Did the trial court err in failing to instruct that respondent had a duty to mitigate its damages?

*No error in denying instruction disallowing respondent recovery on loss of use if vehicle was not repairable.*

There was a jury issue on the question of whether the trailer was repairable. Both Nashban and an employee, Fred Suderland, testified that they did not think the trailer could be restored to a condition which would render it safe once again for use on the highways, especially in light of recent rules and regulations of the federal department of transportation.

A representative of Fruehauf Trailer Corporation, Gregory DuCharme, testified that the trailer could be so repaired and that the company would stand behind

the job; the cost would be approximately $2,363.08 as of the date of the appraisal, September 9, 1968. He also stated, however, that "it would not be up to me to state" whether repair or replacement should be recommended on a damaged vehicle.

Paul Cinquemani, the appraiser who viewed the trailer the day before the trial at appellants' request, testified that the repair could be done but that it would not be economically feasible to repair the trailer, based on his estimate of its value ($1,500).

Appellants contend that since a jury question was presented as to the repairability of the trailer, the jury should have been instructed that if it found the trailer could not be repaired, respondent could recover nothing for loss of use, *i.e.*, the rental costs incurred.

As to recovery for loss of use of a motor vehicle damaged or destroyed, the various jurisdictions are sharply divided on the principle and application.[1]

Wisconsin has little case law on the subject. In *Wright v. Mulvaney*,[2] a case involving damage to a commercial fisherman's net, the jury verdict included an amount for lost profits, based on the average prior catches. The court held this was too speculative. It stated that the proper award was the cost of repairing the net plus "the value of the use of the net during the time they were necessarily deprived of its use, which was about ten days."[3]

As to property totally damaged, two cases present apparently conflicting views:

In *Gould v. Merrill Railway & Lighting Co.*,[4] involving injury to horses used in the business of the plaintiff, the court noted that the plaintiff might recover the loss

---

[1] *See* Annot. (1968), 18 A. L. R. 3d 497.

[2] (1890), 78 Wis. 89, 46 N. W. 1045, 9 LRA 807.

[3] *Id.* at page 98.

[4] (1909), 139 Wis. 433, 121 N. W. 161.

of use of the injured horses, minus normal expenses of keeping them, and then stated:

". . . But where the full value at the time the horse was injured is recovered, there can be no additional recovery for loss of use of the horse." [5]

However, in a recent case, *Schwalbach v. Antigo Electric & Gas, Inc.,*[6] wherein plaintiff's house was totally *destroyed* by a defective furnace explosion, this court stated:

"The proper measure of damages for loss of use of the dwelling house in this instance is an amount equal to the fair rental value of a house of like kind and quality in the area of Eland for such length of time as was reasonably necessary to reconstruct a house comparable to the one destroyed, plus the reasonable value of necessary incidentals occasioned by moving." [7]

Neither of the parties has noted these cases, relying on the annotation (*supra* footnote 1) and the foreign cases cited therein.

The various jurisdictions outside Wisconsin take differing approaches. However, while some jurisdictions do *deny* recovery for loss of use where the damaged property cannot be repaired, others permit such recovery, and the annotation observes:

"It has been noted that the refusal in some jurisdictions to allow damages for loss of use of a totally destroyed vehicle appears to be the result of historical limitations on the action of trover at common law. Attention is called to the fact that cases herein clearly recognizing the right of an owner to recover damages for loss of use of a totally destroyed vehicle, apart from earlier Kentucky decisions stated infra, have occurred for the most part since World War II." [8]

---

[5] *Id.* at page 448.

[6] (1965), 27 Wis. 2d 651, 135 N. W. 2d 263.

[7] *Id.* at page 662.

[8] Annot., *supra,* footnote 1, at page 519, note 12.

The reasoning of the more "modern" approach, as it was referred to by the Florida court [9] in allowing such a recovery, is best exemplified by the following statement of the Indiana Court of Appeals:

". . . We agree with the appellant that seemingly many jurisdictions limit recovery of loss of use to situations where the property is repairable. However, this is not to say that such a position is proper or founded on sound logic. We fail to see any valid reason for the distinction between repairable or irreparable damage which would justify loss of use for the former and not the latter. In what manner can we justify the recognition of loss of use as a property right incidental to ownership in one instance and not the other? Have not both property owners lost the same thing, i.e., the use of such property? To hold to the contrary would be to effectuate a legal principle without a valid reason." [10]

Various other questions must be resolved if such a recovery is recognized:

(a) *Time period of loss of use must be reasonable.*

Again, the various jurisdictions are not in agreement, except that "reasonableness" is the standard, whether loss of use is allowed where the damage is total, or whether limited only to cases of repairability.

[9] *Wajay Bakery, Inc. v. Carolina Freight Carriers Corp.* (D. C. Fla. 1965), 177 So. 2d 544, 546.

[10] *New York Central R. R. v. Churchill* (Ind. App. 1966), 218 N. E. 2d 372, 376. *See also: Reynolds v. Bank of America* (1959), 53 Cal. 2d 49, 345 Pac. 2d 926, 73 A. L. R. 2d 716; *Roberts v. Freight Carriers* (1968), 273 N. C. 600, 160 S. E. 2d 712, allowing recovery *during the period required for replacement.* In addition, Kentucky has long followed this rule: *e.g., Louisville & I. R. Co. v. Schuester* (1919), 183 Ky. 504, 209 S. W. 542, 4 A. L. R. 1344. *Cf., Colonial Motor Coach Corp. v. New York Central R. R.* (1928), 131 Misc. 891, 228 N. Y. Supp. 508.

The Kansas court apparently chose to consider the circumstances of the particular case, noting the propriety of allowing recovery for loss of use where a specially constructed vehicle was destroyed and no replacement was readily available: *Peterson v. Bachar* (1964), 193 Kan. 161, 392 Pac. 2d 853.

For example, while Louisiana denies recovery for loss of use when the vehicle is totally destroyed,[11] the courts of that state have frequently allowed damages for loss of use during a reasonable period while the owner of the vehicle determined the advisability of repairing, even where it was ultimately determined the cost of repair would exceed the value of the vehicle.[12]

Others allow recovery during a reasonable period required for replacement [13] (or reasonably required for repairs [14]). Many courts have allowed recovery for the *total time* required to repair or replace, including, *e.g.*, time consumed by difficulty in getting parts,[15] since the owner is not responsible for such delay. Even inability to pay for repairs once made, when coupled with diligent attempts to mitigate damages, has been held to be properly included within the reasonable time period.[16] In any event, the reasonableness of a party's course of action is for the jury to determine in light of all the circumstances of the particular case.[17]

(b) *The measure of damages for loss of use.*

As for the measure of damages, there is considerable agreement that the cost of hiring or renting another vehicle, during either the period of replacement or repair, is a proper standard for measuring the damages for loss of use.[18] Certainly such a measure would gen-

[11] *Skinner v. Scott* (1959), 238 La. 868, 116 So. 2d 696.

[12] *E.g., Baremore v. Southern Farm Bureau Casualty & Ins. Co.* (La. App. 1962), 147 So. 2d 58.

[13] *E.g.,* California and North Carolina, *supra,* footnote 10.

[14] *See* Annot., *supra,* footnote 1, p. 545, sec. 18.

[15] *Pfingsten v. Westenhaver* (1952), 39 Cal. 2d 12, 244 Pac. 2d 395; *Allen v. Hooper* (1936), 126 Fla. 458, 171 So. 513; *Dixie Highway Express v. C. C. Galbraith & Son* (La. App. 1952), 61 So. 2d 218.

[16] *Gainer v. Storck* (1959), 169 Cal. App. 2d 681, 338 Pac. 2d 195.

[17] *Ziegler v. Wonn* (1963), 18 Wis. 2d 382, 388, 118 N. W. 2d 706.

[18] *See* Annot., *supra,* footnote 1, p. 524, sec. 12 [b].

erally be likely to meet the requirement of reasonably ascertainable damages. Again, a rule of reasonableness as to *amount*, as well as duration, appears to be the consensus, with the amount actually paid, while not conclusive, constituting evidence thereof. At least one court has expressly stated that whether such rental payments were unreasonable was a matter of defense.[19] Other courts have allowed evidence of the usable or rental value of the vehicle damaged as a measure.

While it might be expected that most courts require some showing of the necessity for renting a replacement vehicle, several courts surprisingly do not require an actual rental, while others have required a showing of unavailability in the absence of an actual rental.[20]

(c) *Limitations on total recovery.*

Finally, as a limitation on the recoverable damages, several courts have held that in any event, the total damages for repair or total of depreciation value, plus loss of use, may not exceed the value of the vehicle prior to the accident.[21] But there is considerable conflict in this area as well. This latter limitation to market value preceding the accident seems inconsistent with the "modern" approach—allowing recovery for loss of use in addition to damages for total destruction, and we therefore reject it.

We conclude that it is correct to follow the modern view allowing recovery for loss of use in addition to total damages, even when the vehicle is not repairable. The standard to be applied to such recovery is that of reasonableness under all the circumstances of the particular case. Therefore, damages should be allowed for loss of use (1) during a *time period* reasonably required for replacement, including a reasonable time to determine whether the vehicle is in fact repairable, and (2) in an amount equal to that which was actually expended

---

[19] *Longo v. Monast* (1944), 70 R. I. 460, 40 Atl. 2d 433.

[20] *See generally:* Annot., *supra*, footnote 1.

[21] *Id.* at page 540, sec. 16.

(absent a showing that a temporary replacement was unavailable), provided such amount was not unreasonable.

In the instant case, the jury obviously allowed damages based on a total loss, and the damages awarded were within the range of evidence presented as to the value of the trailer immediately preceding the accident ($3,500–$1,500). The jury also, in the absence of a requested instruction to the contrary, awarded damages for loss of use. This was proper. While there was a conflict in testimony as to the repairability of the trailer, this was for the jury to resolve.

There is nothing in this record to indicate that the damages awarded for loss of use were unreasonable. There is no evidence to indicate the *amount* of the rental charges was unreasonable, and only the amount actually expended therefor was recovered. Nor can it be said as a matter of law that the duration of the rental period was unreasonable. There was evidence of Nashban's inability to obtain satisfaction from the appellant insurance company as to the course to follow. While respondent did rent a substitute trailer from September, 1968, through June, 1969, replacement was ordered in "November or December." Although the trailer did not actually arrive until May, 1969, there was evidence that this length of time was required because of the unusual nature of the trailer which required a special order, and also because of certain labor and economic conditions.

*Prejudicial error committed in failing to instruct that if both the rules of repair cost and diminished market value of damaged trailer were applicable then jury should insert the lesser of the two figures in determining damage to trailer.*

Civil Jury Instruction No. 1805, entitled "Property: Automobile: Damage To," states the rule announced in

*Krueger v. Steffen,*[22] involving damage to an automobile:

> "This court on numerous occasions has stated that the damages that should be awarded to the owner of personal property having a market value is the difference between the value before the tortious injury and the value after. . . ."[23]

This court then noted that the cost of repair might be considered in determining the diminution.

Civil Jury Instruction No. 1804, entitled "Property: Personal: Damage To," presents two rules: diminution in value and cost of repair, noting especially that if the property had no market value, then the cost of repairs applies.

> "If the evidence in this case allows the application of both of the two rules which I have given you, and if, in so applying them, you arrive at two different figures, it is your duty to accept and to insert as your answer to Question . . . the lower of these two figures."

The evidence in this case required the use of this instruction for at least three reasons:

(a) Respondent emphasized throughout that the trailer was unique and that it was worth far more to him because of the nature of his business, implying thereby that it had no readily ascertainable market value, although Nashban estimated its value at $3,500. Appellants' appraiser also indicated there was no "blue book" figure on this particular trailer, estimating its value at $1,500. Hence, under the rule of *Krueger v. Steffen,* the cost of repairs might be seen as the applicable measure of damages.

(b) Respondent further contended that the trailer was completely unrepairable and that he was entitled to damages for its total loss. On the other hand, appellants contended that the trailer was repairable and used one

---

[22] (1966), 30 Wis. 2d 445, 141 N. W. 2d 200.

[23] *Id.* at page 449.

of respondent's own witnesses to support this position: DuCharme testified on cross-examination that his company would stand behind the repair job done.

In light of this evidence, a jury question was presented as to the repairability of the trailer. This evidence would appear to require the court to give Instruction No. 1804, especially in light of the first "comment" to the instruction:

"To be used in a situation where there is evidence as to cost of repairs and as to diminution in market value."

(c) The trial court's comments immediately after dismissing the jury indicate that it thought the verdict of $3,000 for damage to the trailer would not stand in light of the evidence that the cost of repair would be $2,300. The trial court stated:

". . . because the law is that it is either: If they find out there was market value and it was less than the cost of repair, then it is the market value. But where the evidence shows there was no market value to the damaged trailer as such, then 'it is the cost of repair.
". . .
"[*Appellant*] : If the court please, the law refers to either market value or the cost of repair.
"*The Court:* I know; but they could use—let me get the instructions on evaluation.
"[*Respondent*] : I think the instruction is 2504.
"*The Court:* It appears in this case. This was a requested instruction. *But it is the law. . . .*" (Emphasis added.)

The court then proceeded to read Instruction No. 1804:

". . . In arriving at your answer to this question you will be guided by two rules. The first rule is this: When property of the nature of that now under consideration has been damaged, the compensation to be awarded to the owner is the difference between the fair market value of such property immediately before the damage occurred and the fair market value of such property

immediately thereafter. Fair market value is that sum of money which the property would have brought, at the time of and the place where it was damaged, if sold by an owner, willing but not required to sell, to a buyer willing but not required to buy.

"The second rule is this: If property can be restored to its condition before the accident, then the compensation to be awarded to the owner is the reasonable cost of the making of such repairs to the property as will restore it to the condition in which it was prior to the accident.

"You are instructed that the proper measure under the second rule is not the actual cost of such repairs as may have been made, but what it would reasonably cost, under all the circumstances, to restore the property to its former condition.

"If the evidence in this case allows the application of both of the two rules which I have given you, and if, in so applying them, you arrive at two different figures, it is your duty to accept and to insert as your answer the lower of these two figures."

The court then stated:

"On the other hand, how can it accept the lower figure for the cost of repair of $2300-and-something when they had a right to believe the witness when he said that if this was repaired it would not be a safe vehicle on the highway, so this trailer should not be repaired.

"[*Appellant*]: Could I ask, were you reading from 1804?

"*The Court*: Yes.

"[*Appellant*]: That instruction was not given.

"*The Court*: I know it was not. The reason why, in this particular instance *if they believed* the testimony of the plaintiff that this trailer under no circumstances should be repaired because it would be an unsafe vehicle to have on the highway if it was repaired, then that would be disregarded entirely. And that is exactly what the jury believed. The jury believed that in this case you cannot use the cost of repair because this trailer as a safety measure should under no circumstances be repaired. [Emphasis added.]

" . . .

" . . . I think this whole case rested on credibility. I think they believed this man when he said it was not safe to be repaired; not a safe vehicle to be out on the highway. And the insurance company at no time answered this at all. It might have been that they themselves believed it was unsafe to repair or they would have told him to go ahead and get it fixed, which they didn't do."

This entire colloquy indicates some confusion. The court was correct in noting it was entirely a matter of credibility as to repairability (and also as to market value). If so, then Instruction No. 1804 was the appropriate instruction to give the jury.

Under the instruction actually given (No. 1805), even if the jury believed the vehicle was repairable, it was directed to use the estimated cost of repairs only in the process of arriving at diminished market value and not in determining the reasonable cost of making repairs necessary to restore the trailer to its condition prior to the accident.

Clearly this error was prejudicial. By giving Instruction No. 1805 instead of No. 1804, the trial court precluded the jury from finding anything except the diminution of market value. The jury was prevented from finding the cost of repairs which, in this case, was less than the jury felt was the value of the tractor-trailer before the accident.

This court has frequently stated that the test in passing on the prejudicial effect of an erroneous instruction is the probability, not the mere possibility, that the jury was misled thereby.[24] Here it appears that the jury was misled as to the law.

[24] *Menge v. State Farm Mut. Automobile Ins. Co.* (1969), 41 Wis. 2d 578, 584, 164 N. W. 2d 495.

*No error in failure to instruct on respondent's duty to mitigate damages.*

Appellants urge that the failure of the trial court to give an instruction on respondent's duty to act reasonably to mitigate damages [25] was also error prejudicial to their cause.

It is questionable, however, that an issue as to the reasonableness of respondent's course of action was ever raised. In such a case there would be no need to instruct on the duty to mitigate damages.[26] Respondent indicated business reasons for renting a replacement vehicle, pointing also to the lack of cooperation on the part of defendant-insurance company; the reasonableness of the rental charges actually paid, especially in light of what he considered in his twenty years' experience, to be fairly standard rental charges, as indicated by Exhibit 8; and the reasons for the delay in receiving the replacement trailer which was ordered two-three months after the accident.

Appellants came forward with no evidence of the unreasonableness of the rental charges or the rental period. They rather attempted to show (1) that the trailer was repairable, and (2) that the market value of the trailer before the accident was approximately one half the value testified to by Nashban.

Furthermore, even assuming the issue was raised, the refusal to give the requested instruction was harmless error. In examining the instructions as a whole,[27] we find the jury was adequately instructed that both the rental charges and the rental period were to be judged by the standard of reasonableness.

[25] Wis J I—Civil, Part II, 1730.

[26] *Schmidt v. Schabow* (1953), 265 Wis. 154, 159, 60 N. W. 2d 735.

[27] *Rowden v. American Family Ins. Co.* (1970), 48 Wis. 2d 25, 179 N. W. 2d 900.

Two other issues are raised on this appeal that require comment:

1. Was it error for the trial court to admit into evidence respondent's Exhibit 8, a list of rental charges from Clark Rental System?

2. Was it error for the trial court to refuse to require Nashban to comply with appellants' subpoena duces tecum for the production of certain of respondent's corporate records?

### *Respondent's Exhibit 8 properly admitted.*

At trial, plaintiff-respondent introduced this rental schedule, and Nashban indicated that the trailer listed thereon which could adequately meet his company's needs carried a rental charge of $300. He further testified that he actually rented a trailer from M & N Trailer Rentals, Inc., for approximately $186 per month.

Appellants objected to the admission of the schedule, and in proceedings in chambers after the close of testimony further moved that all the rental testimony be stricken and that no question be submitted to the jury on the rental charges because there was no proof of reasonableness.

Appellants urge here that the exhibit was hearsay and that they were unable to cross-examine with respect to the reasonableness of the charges found therein.

Generally, "printed materials, such as pamphlets, brochures, or instruction sheets published by a manufacturer, are not admissible as independent evidence of the truth of the facts stated therein." [28] However, various trade journals, price lists, etc., intended to be circulated generally in the business and to be consulted by interested persons have been held admissible. [29]

[28] 29 Am. Jur. 2d, *Evidence,* p. 990, sec. 886.

[29] *Id.* at page 999, sec. 892. *See also:* 6 Wigmore, *Evidence* (3d ed.), pp. 22, 26, secs. 1702, 1704.

Further, some foundation was laid in that Nashban's competency to speak on the value of the trailer, etc., had already been objected to and the objection overruled on the basis of his twenty years' experience in the trucking industry.[30] Nashban stated he was familiar with rental rates in the industry and that Clark Equipment was in the rental business; that the rates on Exhibit 8 were standard in the industry. Appellants produced nothing to contradict this testimony.

In any event, even if the admission of Exhibit 8 was error, it was harmless error.[31] In light of the uncontradicted testimony of Nashban, and in absence of any evidence that the rental charges actually paid were unreasonable, the jury verdict of $1,818 for rental charges (the exact amount actually paid by respondent) is adequately supported.

*No error in refusing to enforce subpoena duces tecum against Nashban.*

At 2 p. m. on the day preceding the trial, Nashban, respondent's president, was subpoenaed by appellants to bring certain records, especially those showing the number of semitrailers in use in respondent's business between January 1, 1966, and July 1, 1969, including information as to the number of trailers which had been rented during that period of time.

When appellants requested these records at trial, Nashban replied:

"A. I brought whatever—the subpoena came yesterday at 2 o'clock in the afternoon, and it was practically

[30] The competency of such a witness is within the discretion of the trial court, *Doelger & Kirsten v. National Union Fire Ins. Co.* (1969), 42 Wis. 2d 518, 167 N. W. 2d 198, and will not be disturbed in absence of abuse, *Shaurette v. Capitol Erecting Co.* (1964), 23 Wis. 2d 538, 128 N. W. 2d 34.

[31] *Stolze v. Manitowoc Terminal Co.* (1898), 100 Wis. 208, 213, 75 N. W. 987.

impossible to gather any information to bring them into court."

After some discussion and a further request by appellants that the court require Nashban to comply with the subpoena duces tecum, the witness further stated:

"*A.* I brought everything that I could gather.
"...
"*A.* It asked for books and records on the number of trailers and tax returns. I have some tax returns here. Whatever I could get as fast as I could."

At this time the court commented:

"I would suggest in the future that you don't wait until the day before a case is set for trial when you issue subpoenaes; that you give these witnesses time that they can examine their records and go into it. Now, if this man is unable to do it during the course of the trial, of course, I will say the tardiness of the subpoena is excuse for his not complying with it. . . ."

Shortly thereafter, appellants renewed their plea for compliance and the following occurred out of presence of jury:

"*The Court:* This court is not going to be delayed for time to look for records which a person cannot get within a 24-hour period. It looks like this case might go to the jury this afternoon.
"[*Appellants*]: Your Honor, then I would just like to file the original subpoena.
"*The Court:* Surely. This case has been set for trial for some time prior to today. There has been plenty of time to issue a subpoena to have this man make a search for the records. . . ."

The court obviously felt that the time allowed for production of the records was unreasonable.

It is clear that a subpoena duces tecum must be complied with in the absence of a reasonable excuse, the question of reasonableness being for the trial court.[32]

---

[32] 58 Am. Jur., *Witnesses*, p. 37, sec. 26.

". . . A motion or application for a subpoena duces tecum ought to be made sufficiently in advance to permit of compliance with the writ without delaying the trial." [33]

In addition, the court here indicated some doubt as to the relevancy of the records requested. While this court has held that the relevancy of the requested documents need not be alleged in the subpoena duces tecum,[34] it appears to be generally held that this is a matter to be considered in the issuance of, and, it would seem, the compelling of compliance with, the writ.[35] It is, in any event, within the discretion of the trial court.[36]

Here, the appellants have shown nothing which would indicate an abuse of discretion in the trial court's refusal. Similarly, at trial appellants offered nothing to indicate the short notice was unavoidable, etc., nor is there anything in the record that would indicate Nashban was being deliberately uncooperative. In light of the fact that the witness had been examined prior to trial before a court commissioner, these circumstances placed some burden on appellants to come forward with reasons for the short time allowed for production.

*By the Court.*—Judgment reversed and cause remanded with directions to conduct further proceedings not inconsistent with this opinion.

---

[33] 97 C. J. S., *Witnesses*, p. 386, sec. 25 f.

[34] *State ex rel. St. Mary's Hospital v. Industrial Comm.* (1947), 250 Wis. 516, 27 N. W. 2d 478.

[35] 97 C. J. S., *Witnesses*, p. 381, sec. 25 e.

[36] *Id.* at page 387, sec. 25 g.